**FILED**
IN CLERK'S OFFICE
U S DISTRICT COURT E D N Y

★ SEP 3 0 2015 ★

**LONG** ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
HANNAH RODRIGUEZ

               Plaintiff,

       -against-

CAROLYN W. COLVIN
Acting Commissioner, Social Security
Administration,

               Defendant.
-----------------------------------------------------------X
FEUERSTEIN, J.

**ORDER**
14-CV-727 (SJF)

      Hannah Rodriguez ("plaintiff" or "claimant"), *pro se*, commenced this

42 U.S.C. § 405(g) action seeking judicial review of the final determination of defendant

Commissioner of Social Security Administration ("Commissioner") denying plaintiff's

application for disability benefits. The Commissioner now moves for judgment on the pleadings

under Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons that follow, the

Commissioner's motion is granted.

I.      BACKGROUND

    A.    Administrative Proceedings

      Plaintiff applied for disability insurance benefits and Supplemental Security Income (SSI)

on December 28, 2009. [Docket Entry No. 21 (Transcript of Administrative Record (Tr.)) 212–

13]. She also filed as a disabled adult child under her parents' wage records on January 5, 2010,

claiming that she was disabled since birth due to hepatitis C, liver cirrhosis, asthma, and a

learning disability. Tr. 242, 246. Both applications were denied. *Id.* at 94–96. Plaintiff

requested a hearing and appeared with counsel before administrative law judge (ALJ) Jay L.

Cohen on February 17, 2011. *Id.* at 77–93.

At the hearing, she amended her onset date to November 15, 2009. *Id.* at 80. On May 6, 2011, the ALJ determined that plaintiff was not disabled from November 15, 2009, through December 31, 2009, the date she was last insured, and denied her disability benefits. *Id.* at 106. The Appeals Council remanded because the May 6, 2011, decision failed to adjudicate plaintiff's disabled adult child and SSI benefits from January 1, 2010 through May 6, 2011, the date of the ALJ's decision. *Id.* at 108.

Plaintiff appeared again with counsel before ALJ Seymour Rayner on October 9, 2012, for a *de novo* hearing. *Id.* at 42–69. On October 18, 2012, the ALJ denied her disabled adult child benefits, disability, and SSI, finding that she had not been disabled before attaining age twenty-two (22), and that she had not been disabled from November 15, 2009, though the date of the decisions. *Id.* at 12–19, 23–30, 34–41. On November 29, 2013, the Appeals Council denied her request for review. *Id.* at 5–7. Plaintiff commenced this appeal. [Docket Entry No. 1]. On October 16, 2014, the Commissioner moved for judgment on the pleadings [Docket Entry No. 19].

B.    Testimony

Plaintiff, born November 18, 1988, has congenital hepatitis C, which led to liver cirrhosis. Tr. 575, 87. She takes medication for her liver disease, but claims that it does not work. *Id.* at 88. She also has asthma, uses an inhaler, has suffered attacks, and has visited the emergency room. *Id.* The last visit occurred on November 10, 2010. *Id.*

Plaintiff's cirrhosis affects her ability to work full-time because it causes pain and fatigue, which is "the main problem." *Id.* at 61. She also experiences nausea and dizziness. *Id.* at 55. This medical condition requires regular check-ups, blood work, magnetic resonance

2

imaging (MRI) and computerized tomography (CT) scans, and has caused her to be hospitalized and to visit the emergency room. *Id.* at 66–67.

Plaintiff complains of sharp pain in her right side, which she has experienced since age five (5), as well as headaches, and back pain. *Id.* at 262. Walking, climbing stairs, and stress exacerbate her pain. *Id.* at 263. She takes Motrin and Tylenol every two (2) hours to control the pain. *Id.* at 263. This pain limits her daily activities because it causes fatigue. *Id.*

In addition, her liver illness interferes with her ability to work by causing her stress. *Id.* at 56. She suffers from depression, and a general anxiety disorder which causes her to become "antsy" and ineffectual at work, and requires her to take additional breaks. *Id.* at 58–59. She frequently suffers panic attacks and has problems focusing, which would prevent her from working in an office. *Id.* at 58. Plaintiff also has anger issues. *Id.* at 60.

Plaintiff left high school after completing the eleventh grade, received a GED in New Hampshire, but has been unable to obtain one in New York. *Id.* at 575, 57–58. She trained to become an EMT, but did not receive a certification. *Id.* Between June 2007 and September 2008, she worked part-time in retail and food service jobs. *Id.* at 565. She worked part-time as a salesperson at "Lucky" brand jeans from September 2011 to February 2012, but was dismissed for taking too many medical absences. *Id.* at 50-52. She worked as a sales person at Tommy Hilfiger from April 2012 to September 2012, but was again dismissed for taking too many medical absences. *Id.* at 52–53. These jobs involved lifting less than ten pounds (10 lbs), walking for up to two (2) hours, and standing for up to five (5) hours. *Id.* at 266–69. She was capable of lifting up to thirty pounds (30 lbs). *Id.* at 86.

3

Plaintiff lives at home with her parents. *Id.* at 254. She does not prepare her own meals, or drive, but she uses public transit, goes out alone every other day, shops for medications, and necessities, socializes, watches television, listens to music, has no problems with her personal care, and sometimes cleans. *Id.* at 255–57. She can follow spoken instructions, concentrate, and interact well with others, but has difficulty completing tasks due to her low energy levels and fatigue. *Id.* at 260.

C.    Psychological Evidence

On June 4, 1993, when plaintiff was four-and-a-half (4.5) years old, the New York City Public Schools classified her as "emotionally disturbed," and gave her speech therapy and counseling. Tr. 307. An educational evaluation when plaintiff was in the tenth grade reflects that plaintiff was articulate, nervous, pleasant, cooperative, that she interacted appropriately, but lacked confidence in her academic ability. Her reading score fell within the average range, but her oral language score was below average, as were her visual–spatial abilities, verbal abilities, and short-term auditory memory, and her math skills were at a third grade level. *Id.* at 310.

Plaintiff was hospitalized at Mount Sinai Hospital (Mount Sinai) for depression related to her liver treatment on January 11, 2005, after her mother found her cutting herself. *Id.* at 324–25, 328, 367. She was having difficulties at home and at school. *Id.* at 328. She attended a partial psychiatric hospitalization program seven days a week thereafter. *Id.* at 337.

On February 2, 2005, plaintiff was again admitted to Mount Sinai for self-cutting, and was diagnosed as suicidal. *Id.* at 354–65. She had stopped her liver treatment four days earlier. *Id.* at 354. She appeared calm, oriented, well-groomed, had good attention and psychomotor

4

behavior, no agitation, but was mildly depressed. *Id.* at 355. Plaintiff was diagnosed with impulse control disorder, borderline personality disorder, and depression. *Id.* at 355.

On March 11, 2005, she drank a half a bottle of Motrin in an attempt to sleep, and was taken to the hospital by her parents, who were concerned that she had attempted suicide. *Id.* at 345–46. Plaintiff was admitted for psychiatric care, and Zoloft and Seroquel were prescribed. *Id.* at 339.

On February 18, 2010, Dr. Toula Georgiou, Psy.D., at Industrial Medicine Associates, P.C., evaluated plaintiff's intelligence using a Wide Range Achievement Test. *Id.* at 433–34. Overall, she performed at a seventh grade level in verbal comprehension, working memory, perceptual reasoning, and processing speed. *Id.* at 434. Her full scale IQ was 79. *Id.* "She is able to follow and understand simple directions and instructions, perform simple tasks independently, attend to and concentrate on tasks, maintain a regular schedule, make decisions, relate with others, and deal with stress." *Id.* at 435. However, he also indicated that she might face difficulties learning new tasks and performing complex tasks due to her borderline intellectual functioning. *Id.* She had been in special education since the third grade. *Id.* at 434.

Plaintiff was relaxed and comfortable throughout the examination, was able to recall and understand instructions, worked with deliberation, care, and reflection, was able to concentrate, and exhibited no emotional distress. *Id.* She was able to dress, bathe, groom, cook, clean, do laundry, shop, and use public transportation, though she expressed a reluctance to handle money because of her poor math skills. *Id.* at 435. Her family relationships and relationships with others were described as good, and she stated that in her spare time, she wrote poems, looked for work, and helped her sister babysit. *Id.*

On March 23, 2010, Dr. E. Charles, a psychiatrist performed a psychiatric review, and found that plaintiff's impairment, her organic mental disorder, was not severe. *Id.* at 438. As for the "Paragraph B criteria," he opined that her organic mental disorder did not cause her any restriction of her daily activities, difficulties in maintaining social functioning, and did not cause any episodes of deterioration of extended duration, but did cause "mild" difficulties in concentration, persistence, or pace. *Id.* at 448. He found no evidence of the presence of any "Paragraph C criteria." *Id.* at 449.

On July 22, 2010, plaintiff reported relationship problems with her boyfriend, and she appeared depressed. *Id.* at 507–08. She was prescribed Citalopram. *Id.* at 511.

On December 14, 2011, the Family Service League's Journey House assessed plaintiff's ability to function, and listed her "meaningful activities" as "working at Lucky Brand Jean, learning how to box, going to the gym, and shopping." *Id.* at 574, 579. It further noted that she had previously attended anger management when she was fifteen (15) years old, that she received treatment for depression when she was sixteen (16) years old, and that she left school in grade eleven (11), and had not received her GED in New York. *Id.* at 574–75. Plaintiff denied any violent tendencies but reported that she had problems with anger and aggression, communication skills, and her family relationships. *Id.* at 578–79. The assessment diagnosis was a learning disorder not otherwise specified, depressive disorder not otherwise specified, but indicated that she had a support network, and could benefit from learning coping skills for anger and depression. *Id.* at 582.

On May 8, 2012, Dr. Gina Patalano, Ph.D., a psychologist at the Family Wellness Center, wrote in a report that plaintiff was being monitored monthly by her physician for her liver

condition, which had stabilized, and is currently on a liver transplant list. *Id.* at 567. Dr. Patalano noted that plaintiff worked at a retail clothing store, which had just increased her hours to twenty-eight (28) hours per week. *Id.* at 568. Plaintiff was "stylishly-dressed and well-groomed," and gave well thought-out responses," was "cooperative," "congenial," and engaged in "spontaneous conversation." *Id.*

Her full scale IQ was 79, as measured by the Wechsler Adult Intelligence Scale, corresponding to a borderline range of intellectual functioning. *Id.* at 568. Her verbal comprehension score was 87, a low average range of functioning, which suggested that plaintiff might face difficulties with abstract verbal reasoning. *Id.* at 568–69. Her perceptual reasoning was 75, which fell within the borderline range, meaning that without interpersonal support, she would have difficulties with practical problems, such as predicting patterns and logical outcomes. *Id.* at 569. Her working memory score, which included concentration, general math reasoning, and short-term recall of rote stimuli also fell within the borderline range, and Dr. Patalano noted attention deficit issues. *Id.* at 569.

Plaintiff scored average on her processing speed, which meant that when provided with structure and clearly-defined goals, such as a time-limit, "she can be efficient, accurate, and fast using visual-motor integration." *Id.* at 569. She had a moderately low level of adaptive functioning overall, with moderately low communication skills, domestic and community based skills, and socialization skills. *Id.* at 569–70. Plaintiff showed elevated levels of maladaptive behavior traits, especially internalizing and externalizing tendencies, which "tend[ed] towards being problematic," but did not reach clinically significant levels. *Id.* at 570. Dr. Patalano concluded:

7

[Plaintiff], 23 years of age at the time of this evaluation, is a young woman of probable Low Average intellectual potential, who is presently functioning, generally, at the Borderline level of intelligence. Lowering in functioning below potential appears to be on the basis of relative difficulties in the areas of perceptual-motor integrating skills, general reasoning and problem-solving on a non-verbal basis, as well as general attention/concentration deficits. As is the case with many individuals dealing with attention deficit issues, [plaintiff's] performance can be very variable, depending on the level of motivation she intrinsically feels, and on the amount of structure and support provided. Seems generally motivated to succeed, which can help her compensate for other skills which are more lacking. Strengths appear to be in the areas of general word knowledge and knowledge/awareness of facts gleaned from the world around her. She would function most effectively in situations which people provide more clear-cut goals and structure.

*Id.* at 570. It did not meet the minimum score requirements to qualify for services. *Id.*

Dr. Patalano recommended therapy to address plaintiff's impulsivity, anxiety, and possible depression. *Id.* at 571. According her, plaintiff was capable of self-sufficiency and being goal-oriented, but her family "strife undermine[d] these strengths." *Id.* She stated that psychiatric evaluation "may qualify [plaintiff] for supported housing on the basis of psychiatric disability." *Id.* Her "rule-out" diagnoses for plaintiff were attention deficit hyperactivity disorder, panic disorder, and oppositional disorder. *Id.*

The University of the State of New York, Office of Vocational and Educational Services (VESID) evaluated plaintiff on June 19, 2012 for her asthma, kidney stones, hepatitis C and compensated cirrhosis, and portal hypertension. *Id.* at 585. Plaintiff complained of fatigue, weakness at times, malaise, and stomachaches, but no acute distress. *Id.* at 585–86. Her prognosis for her liver condition without treatment was stable and would only need medical monitoring every six months, and she could be rid of the hepatitis C virus with treatment. *Id.* at 586. He was advised against sitting or standing for long periods, and "excessive exercise." *Id.*

8

She could use public transportation, but may be too weak and fatigued to do so "when [her] disease flares up." *Id.*

        D.      Medical Evidence

        Plaintiff was born with hepatitis C, and with crack cocaine and alcohol in her blood. Tr. 347. Dr. Benjamin Schneider, M.D., a pediatrician at Mount Sinai Hospital treated plaintiff for hepatitis C from 2001 to 2004. *Id.* at 484–500, 507. On October 30, 2001, he examined her in the Pediatric Liver Program, and wrote that she had completed two (2) months of treatment with Interferon and ribavirin for decompensated cirrhosis from hepatitis C. *Id.* at 499. "She [had] tolerated treatment reasonably well." *Id.* He noted mild splenomegaly, borderline neutropenia, but no evidence of ascites. *Id.* Her hepatitis C RNA had diminished from one million copies per milliliter (ml) to 250,000 per milliliter (ml), which he characterized as "an encouraging response." *Id.*

        On April 1, 2002, he wrote that she was still undergoing treatment with Interferon and ribavirin in the hopes of eradicating the hepatitis from her system prior to receiving a liver transplant. *Id.* at 498. "In light of her end-stage liver disease, liver transplantation may be her only chance for long-term survival." *Id.*

        By May 23, 2002, plaintiff had completed nine (9) months of treatment for her chronic, end-stage liver disease. *Id.* 497. He described the treatment as "arduous," "akin to chemotherapy," and stated that the side-effects often caused behavioral problems and difficulties in school. *Id.* On May 29, 2002, her vital signs were unremarkable, she was "having a very good response to treatment," and that "[g]iven her excellent, but somewhat delayed

response . . . we may extend her therapy beyond one year in an effort to eradicate the virus from her system." *Id.* 495–96.

On September 30, 2002, he wrote that although she was on the liver transplant wait-list, he did not want to proceed with a liver transplant yet. *Id.* at 487. The lab results were stable with no evidence of decompensation of her cirrhosis or flare-up of her hepatitis. *Id.*

On May 12, 2004, he wrote that her lab tests "revealed a stable liver profile," that her synthetic function and liver profile were unchanged. *Id.* at 484. She had no abdominal pain, no respiratory distress, and was taking medications for her liver condition. *Id.* He stated that the results were "very encouraging," and that with Interferon and ribavirin, "we might be able to clear the hepatitis C from her system." *Id.* at 485.

On February 1, 2005, Dr. Carolina Rumbo, M.D., a pediatric hepatologist at Mount Sinai wrote to Maria C. White, an educational consultant, to inform her of plaintiff's progress in her liver treatment. *Id.* at 320–21. Plaintiff was three (3) months into treatment with pegylated Interferon and ribavirin, and was taking Albuterol and a course of vitamins. *Id.* at 320. Plaintiff had been suffering mood changes and behavioral problems. *Id.* Because the treatment had not decreased plaintiff's viral load, they discontinued it. *Id.*

On June 16, 2009, an MRI showed no significant intra- or extrahepatic bile ducts, patent portal and hepatic veins, normal direction of flow in the portal vein, and fluid in her gall bladder. *Id.* at 406. Her spleen was a normal size, she had no adrenal mass, and her pancreas was unremarkable. *Id.* It did, however, reveal a stable 1.9 centimeter (cm) hepatic lesion, but which did not suggest hepatocellular carcinoma. *Id.* at 407. On September 2, 2009, Dr. Sasan Roayie, M.D., a surgical oncologist at Mount Sinai, reviewed the MRI results, and concluded that

because of her hepatitis C diagnosis, she was at-risk for hepatocellular cancer, but that the MRI did not indicate a tumor. *Id.* at 466.

On January 19, 2010, Dr. Douglas Dieterich, M.D., at Mount Sinai, noted that plaintiff was undergoing treatment with Interferon, ribavirin, and Albuterol, that she was in no acute distress, and that physical examination was unremarkable. *Id.* at 420–21. On February 25, 2010, plaintiff denied any complaints. *Id.* at 518–20.

On March 25, 2010, she reported that she had a miscarriage, and that she had stopped liver treatment. *Id.* at 512. She was not in acute distress, was well-nourished, and had no hepatomegaly, but some splenomegaly. *Id.* at 513–15. Although an earlier MRI had revealed a dysplastic nodule, a CT scan did not reveal its presence. *Id.* at 514. The lesion was "not worrisome." *Id.* at 512.

On April 22, 2010, plaintiff complained of fatigue, and resulting inability to work proficiently. *Id.* at 474. Dr. Dieterich ordered an endoscopy. *Id.* at 475. An esophagogastroduodenoscopy (EGD) revealed hypertensive portal gastropathy. *Id.* at 502. A biopsy performed in August 2010 showed that plaintiff's gastric gland mucosa was within normal limits, and she tested negative for H. Pylori. *Id.* at 504. A physical examination was unremarkable, and plaintiff's medication for depression was discontinued. *Id.* at 535, 539.

A November 24, 2010 CT scan showed mild splenomegaly and no significant change from earlier exams. *Id.* at 545. Plaintiff's liver was cirrhotic without enhancing mass, and her lesion was stable. *Id.* On January 6, 2011, plaintiff reported stomach pain and nausea to staff at Mount Sinai, but no diarrhea, vomiting, or fever. *Id.* at 553. Her physical examination was unremarkable. *Id.*

11

Dr. Osvaldo Fulco, M.D. answered interrogatories on March 24, 2011. *Id.* at 562–64. He listed as her severe impairments, congenital hepatitis C, liver cirrhosis, and portal hypertension, and noted that she had not responded to antiviral treatment. *Id.* at 562–63. He opined that none of her impairments equaled the severity in a Listing. *Id.* at 562. He stated that plaintiff has a high viral load for hepatitis C, and minimal elevation in her liver enzymes, but was asymptomatic with no signs of gastrointestinal bleeding. *Id.* at 563. She retained the residual functional capacity (RFC) to occasionally lift and carry twenty pounds (20 lbs) and to frequently lift and carry ten pounds (10 lbs), to stand, sit, or walk for six (6) hours in an eight (8)-hour work day. *Id.* at 563.

On October 8, 2012, Dr. Dieterich performed another EGD, which again revealed portal gastropathy. *Id.* at 586.

E.     ALJ Decision

The ALJ issued three (3) separate decisions which employed the five (5)-step sequential analysis set forth in 20 C.F.R. § 404.1520, found that plaintiff was "not disabled" within the meaning of the Social Security Act, and denied her applications for disabled adult child benefits, SSI, and disability benefits. Tr. 19, 30, 41. He found that plaintiff had not yet turned twenty-two (22) as of the onset date, and had not engaged in substantial gainful activity since the onset date. *Id.* at 14, 27, 37. He found that plaintiff's hepatitis C, liver cirrhosis, and portal hypertension were severe impairments, but that her learning disability and borderline intellectual functioning were not because she had no limitation in her daily activities, social functioning, and had only mild limitations in her concentration. *Id.* at 14, 26, 38. He credited the opinion of Dr. Georgiou, finding it consistent with the medical evidence, and the assessment from VESID, which did not

12

note any mental impairments. *Id.* at 14, 26, 38. And, although plaintiff had experienced prior episodes of behavioral problems and depression, she was able to work and pursue meaningful activities in her recreation time, which suggested that her impairment was nonsevere. *Id.* None of plaintiff's severe impairments met or exceeded one of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* at 18, 27, 40.

At step three (3), the ALJ found that plaintiff retained the residual functional capacity (RFC) to perform a full range of sedentary work because she could sit for six (6) hours and stand or walk for two (2) hours in an eight (8)-hour workday, and occasionally lift or carry ten pounds (10 lbs), except that plaintiff had to avoid respiratory irritants. *Id.* at 16, 27, 39. The ALJ pointed to the medical records from Mount Sinai from 2005 that showed that plaintiff's liver condition was stable, and that she had ceased treatment. *Id.* Her 2009 MRI showed that her liver lesion was stable, and her physical exams from 2004 to 2009 were unremarkable. *Id.* at 16–17, 27, 39. Her liver though cirrhotic, was in stable condition, as evidenced by lab tests and CT scans showing stable enzyme levels, though high viral load. *Id.* at 17, 27, 39. Dr. Schneider, a treating physician and liver specialist, also opined that plaintiff was "doing well," she experiences no respiratory distress, abdominal pain, and her liver was stable. *Id.* at 17, 28, 39. Dr. Roayie also found that her liver lesion was asymptomatic. *Id.*

The ALJ assigned considerable weight to the opinion of Dr. Fulco because he found it consistent with plaintiff's treatment records from Mount Sinai. *Id.* at 17, 28, 39. He opined that plaintiff had severe impairments including her congenital hepatitis C, liver cirrhosis, and portal hypertension, though none of these severe impairments met a listed impairment. *Id.*

The ALJ pointed out that no treating or examining physician opined that plaintiff was precluded from all vocational activity, that her daily living activities are inconsistent with her subjective complaints of pain, and that these complaints of pain and fatigue were not consistently documented in the medical record, all of which failed to support her allegations of disability. *Id.* at 17, 28, 39–40.

At step four (4), the ALJ found that plaintiff could not perform past relevant work, and proceeding to step five (5), found that she was not disabled under the Medical–Vocational Guidelines because she could perform a full range of sedentary work. *Id.* at 18–19, 29–30, 41.

II.     DISCUSSION

      A.     Standards of Review

            1.     Rule 12(c)

Rule 12(c) of the Federal Rules of Civil Procedure provides that "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). The standard applied to a Rule 12(c) motion is the same as that applied to a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010). To survive such a motion, "a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed.2d 868 (2009) (internal quotation marks omitted). The court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party. *Id.* at 679. The court is limited "to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to

matters of which judicial notice may be taken." *Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991).

2.  Review of Determinations by the Commissioner of Social Security

A court reviewing the final decision of the Commissioner may enter "judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A district court must consider whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Brault v. Social Sec. Admin., Com'r*, 683 F.3d 443, 447 (2d Cir. 2012) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). "[S]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (internal quotation marks and citation omitted). "In determining whether the [Commissioner's] findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* (internal quotation marks and citation omitted).

Although the Commissioner's findings of fact are binding as long as they are supported by substantial evidence, this deferential standard of review does not apply to the Commissioner's conclusions of law or application of legal standards. *See Byam v. Barnhart*, 336 F.3d 172, 179 (2d Cir. 2003); *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984). Rather, courts have a statutory and constitutional duty to ensure that the Commissioner has applied the correct legal standards, regardless of whether the Commissioner's decision is supported by substantial evidence. *See Pollard v. Halter*, 377 F.3d 183, 188–89 (2d Cir. 2004). If a court finds that the

Commissioner has failed to apply the correct legal standards, the court must determine if the "error of law *might* have affected the disposition of the case." *Id.* at 189 (emphasis added). If so, the Commissioner's decision must be reversed. *Id.*; *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). If the application of the correct legal standard could lead only to the same conclusion, the error is considered harmless and remand is unnecessary. *See Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010).

B.     Evaluation of Disability

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability benefits are only available where an individual has a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). For the purposes of this section:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

The regulations promulgated under the Social Security Act require the Commissioner to apply a five (5)-step sequential analysis to determine whether an individual is disabled under

Title II of the Social Security Act. 20 C.F.R. § 404.1520; *see also Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). The first step of the sequential analysis requires the Commissioner to determine whether the claimant is engaged in "substantial gainful activity."

20 C.F.R. § 404.1520(a)(4)(i) and (b). "Substantial work activity" "involves doing significant physical or mental activities." 20 C.F.R. § 416.972(a). "Gainful work activity" "is the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 416.972(b). If a claimant is doing "substantial gainful activity," the claimant is not disabled.

20 C.F.R. § 404.1520(a)(4)(i) and (b). If the claimant is not engaged in any "substantial gainful activity," the Commissioner proceeds to the second step.

The second step requires the Commissioner to consider the medical severity of the claimant's impairment to determine whether he or she has a "severe medically determinable physical or mental impairment that meets the duration requirement in 20 C.F.R. § 404.1509, or a combination of impairments that is severe and meets the duration requirement." 20 C.F.R. § 404.1520(a)(4)(ii). An impairment, or combination of impairments, is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities."

20 C.F.R. § 404.1520(c). To meet the duration requirement, the claimant's impairment must either be "expected to result in death, [or] it must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 404.1509. The Commissioner will proceed to the next step only if the claimant's impairment is medically severe and meets the duration requirement.

At the third step, the Commissioner considers whether the claimant has a medically severe impairment that "meets or equals one of [the] listings in appendix 1 to subpart P of [20

C.F.R. Part 404 of the Social Security Act] and meets the duration requirement." 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant's impairment meets or equals any of the listings and meets the duration requirement, the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(d). If the claimant is not found to be disabled at the third step, the Commissioner must "assess and make a finding about [the claimant's] residual functional capacity [("RFC")] based on all the relevant medical and other evidence." 20 C.F.R. § 404.1520(e). The RFC considers whether "[the claimant's] impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what [the claimant] can do in a work setting." 20 C.F.R. § 404.1545(a). The RFC is "the most [the claimant] can still do despite [his or her] limitations." *Id.*

At the fourth step, the Commissioner compares the RFC assessment "with the physical and mental demands of [the claimant's] past relevant work." 20 C.F.R. §§ 404.1520(a)(4)(iv) and (f). If the claimant can still do his or her past relevant work, the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant cannot do his or her past relevant work, the Commissioner proceeds to the fifth and final step of the sequential analysis.

At the fifth step, the Commissioner considers the RFC assessment "and [the claimant's] age, education and work experience to see if [the claimant] can make an adjustment to other work." 20 C.F.R. § 404.1520(a)(4)(v). If the claimant can adjust to other work, the claimant is not disabled. *Id.* If the claimant cannot adjust to other work, the claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(v). The claimant bears the burden of proving first four (4) steps of the sequential analysis, while the Commissioner bears the burden at the last step. *See Talavera*, 697 F.3d at 151.

C.    Application of the Five-Step Sequential Analysis

The Commissioner argues that the ALJ's finding that plaintiff was not disabled is supported by substantial evidence and that he properly assessed her credibility regarding her symptoms. Defendant's Brief (Def.'s Br.) 19–27. For the following reasons, the Court agrees, and affirms.

The Court finds substantial evidence in the record to support the ALJ's findings at steps one (1) through three (3). Plaintiff's earnings records from her various part-time and seasonal jobs indicate that she earned below the level necessary to constitute "substantial gainful activity" levels. Tr. 214–41; *see* 20 C.F.R. § 404.1574(b)(ii)(B). The opinions of Drs. Charles and Georgiou supported the ALJ's finding that plaintiff's learning disorder and borderline intellectual functioning, her depression, anxiety, and behavioral issues were nonsevere, and that these disabilities equaled in severity the criteria set forth in Listing 12.04, 12.05, or 12.06, or satisfied the "Paragraph B" criteria. *Id.* at 433–35, 438, 448. The Family Service League, Dr. Charles, and Dr. Patalano confirmed that plaintiff had no restrictions in her daily living, no restrictions in her social functioning, no episodes of decompensation, and only "mild" concentration problems. *Id.* at 448, 574, 579, 567, 570.

And, while the medical records from Mount Sinai indicate that plaintiff suffered from liver cirrhosis as a result of her hepatitis C, a liver lesion, and portal hypertension, they indicated that these conditions were stable, and that they did not cause her acute distress. *Id.* at 420–21, 513–14, 518–20, 535, 539, 553. Dr. Fulco's findings echoed Mount Sinai's, and he opined that although plaintiff's conditions constituted severe impairments, they did not equal a Listing in severity. *Id.* at 562. He stated that plaintiff has a high viral load for hepatitis C, and minimal

elevation in her liver enzymes, but was asymptomatic with no signs of gastrointestinal bleeding. *Id.* at 563. Moreover, according to him, her RFC allowed her to occasionally lift and carry twenty pounds (20 lbs) and to frequently lift and carry ten pounds (10 lbs), to stand, sit, or walk for six (6) hours in an eight (8)-hour work day. *Id.* at 563.

When a claimant's impairments fail to meet or equal any of the Listings, the Commissioner must assess the claimant's RFC before proceeding to the fourth step of the sequential analysis. 20 C.F.R. §§ 404.1520(e); 404.1545(a)(5). The Commissioner's RFC assessment must be based on "all of the relevant medical and other evidence" in the case record, including "any statements about what [the claimant] can still do that have been provided by medical sources" and any "descriptions and observations of [the claimant's] limitations from [his or her] impairments, including limitations resulting from [his or her symptoms], such as pain, provided by [the claimant] or [other persons]." 20 C.F.R. § 404.1545(a)(3). In addition, the Commissioner must consider the claimant's "ability to meet the physical, mental, sensory, and other requirements of work." 20 C.F.R. § 404.1545(a)(4). Both a "limited ability to perform certain physical demands or work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching)" (20 C.F.R. § 404.1545(b)), and a "limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and work pressures in a work setting" (20 C.F.R. §404.1545(c)), may reduce a claimant's ability to do past or other work. 20 C.F.R. § 404.1545(e) provides that:

> [w]hen [a claimant] ha[s] severe impairment(s), but [his or her] symptoms, signs, and laboratory findings do not meet or equal those

of a listed impairment in [the Listings], [the Commissioner] will consider the limiting effects of all [the claimant's] impairment(s), even those that are not severe, in determining [his or her] residual functional capacity. Pain or other symptoms may cause a limitation of function beyond that which can be determined on the basis of the anatomical, physiological or psychological abnormalities considered alone...In assessing the total limiting effects of [a claimant's] impairment(s) and any related symptoms, [the Commissioner] will consider all of the medical and nonmedical evidence...

20 C.F.R. § 404.1545(e).

In "determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account . . . but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citations omitted). The ALJ retains discretion to assess the credibility of a claimant's testimony regarding disabling pain and "to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979); *Snell v. Apfel*, 177 F.3d 128, 135 (2d Cir. 1999) (holding that an ALJ is in a better position to decide credibility). "Because it is the function of the agency, not reviewing courts, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant, we will defer to its determinations as long as they are supported by substantial evidence." *Reynolds v. Colvin*, 570 F. App'x 45, 49 (2d Cir. 2014) (summary order) (internal citations omitted). The Second Circuit has "repeatedly held that a claimant's testimony concerning his pain and suffering is not only probative on the issue of disability, but 'may serve as the basis for establishing disability, even when such pain is unaccompanied by positive clinical findings or other 'objective' medical evidence.'" *Hankerson*

*v. Harris*, 636 F.2d 893, 895 (2d Cir. 1980) (quoting *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979)). Thus, where there is a "medically determinable impairment[] that could reasonably be expected to produce [the claimant's] symptoms, such as pain," the ALJ "must then evaluate the intensity and persistence" of the symptoms to determine how the symptoms limit a claimant's capacity for work. 20 C.F.R. § 404.1529(c)(1). "Further, because a claimant's symptoms, such as pain, 'sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone,' once a claimant has been found to have a pain-producing impairment, the Commissioner may not reject the claimant's statements about his pain solely because objective medical evidence does not substantiate those statements." *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 349–50 (E.D.N.Y. 2010) (citing 20 C.F.R. § 404.1529(c)(2)-(3)).

In assessing a claimant's allegations concerning the severity of his symptoms, an ALJ must engage in a two (2)-step analysis. First, "the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." *Genier*, 606 F.3d at 49 (citing 20 C.F.R. § 404.1529(b)). Second, [i]f the claimant does suffer from such an impairment . . . the ALJ must consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record." *Id.* If plaintiff's testimony concerning the intensity, persistence or functional limitations associated with his impairments is not fully supported by clinical evidence, the ALJ must consider additional factors in order to assess that testimony, including: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain; (5) any treatment, other than medication,

that the claimant has received; (6) any other measures that the claimant employs to relieve the pain; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain. 20 C.F.R. § 404.1529(c)(3)(i)-(vii); *Meadors v. Astrue,* 370 Fed. Appx. 179, 183 n.1 (2d Cir. 2010) (citing 20 C.F.R. 404.1529(c)(3)). An ALJ who finds that a claimant is not credible must do so "explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his determination is supported by substantial evidence." *Rivera v. Astrue,* No. 10-civ-4324, 2012 WL 3614323, at *14 (E.D.N.Y. Aug. 21, 2012) (quoting *Taub v. Astrue,* No. 10-civ-2526, 2011 WL 6951228, at *8 (E.D.N.Y. Dec. 30, 2011)).

The ALJ properly followed this two (2)-step process, and based on substantial evidence, found that plaintiff has the RFC to perform sedentary work, in spite of her subjective complaints of pain. In making this finding, he relied on the medical records from Mount Sinai, which showed that her liver condition had stabilized, that she had discontinued treatment, that her physical examinations revealed nothing remarkable, and that lab tests revealed stable liver profiles, which included minimal enzyme elevations, though high viral load. *See* 20 C.F.R. § 404.1529(c)(2) (providing that ALJ will consider "objective medical evidence" in assessing claimant's subjective complaints of pain); 20 C.F.R. § 404.1529(c)(3)(iii) (providing that ALJ may consider treatment required for condition to determine severity). Likewise, he correctly pointed out that no treating or examining physician opined that she could not work, and that the medical evidence did not document consistent pain.

He also properly considered the fact that she was self-sufficient and had no restrictions in her daily living activities. 20 C.F.R. § 404.1529(c)(3)(i). This finding was supported by, among

other things, Dr. Patalano's report, which also indicated that plaintiff was working twenty-eight (28) hours per week, further suggesting that plaintiff was not disabled beyond the level indicated by the medical evidence. Tr. 568. In sum, the ALJ did not unreasonably reject plaintiff's subjective complaints of pain when determining her RFC, but instead properly assessed these complaints in light of the factors set forth in 20 C.F.R. § 404.1529(c).

Finally, there is no error in the ALJ's finding that plaintiff could perform a full range of sedentary work, in spite of her asthma. He properly applied Medical–Vocational Rule 201.27 as a guide to determine that plaintiff could perform unskilled sedentary work, but also considered SSR 96-9p, which explains that "few occupations in the unskilled sedentary occupational base" expose workers to environmental hazards, such as irritants. *See, e.g., Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999) (explaining that ALJ may satisfy burden at step five (5) by resorting to Medical–Vocational Rules).

### III. CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure is granted.

**SO ORDERED.**

s/ Sandra J. Feuerstein<br>
Sandra J. Feuerstein<br>
United States District Judge

Dated: September 30, 2015
      Central Islip, New York